The FROG, SWITCH & MANUFAC-TURING COMPANY, Petitioner

v.

PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2005.

Decided Oct. 27, 2005.

---

2.  75 Pa.C.S. § 1547(b)(2).

3.  75 Pa.C.S. § 3802(a)(1).

4.  75 Pa.C.S. 3804(c).

5.  75 Pa.C.S. 3804(k).

656

Andrew L. Levy, Harrisburg, for petitioner.

Ronald W. Chadwell, Asst. Chief Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and LEADBETTER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge PELLEGRINI.

The Frog, Switch & Manufacturing Company (Employer) appeals an order of the Pennsylvania Human Relations Commission (Commission) finding that Employer retaliated against Wilmer Baker (Complainant) for participating in Commission cases and for opposing unlawful practices under the Pennsylvania Human Relations Act (Act)[1] and awarding back pay, lost overtime pay and interest thereon to Complainant for the time he was terminated from employment until he was reinstated.

Employer hired Complainant as a rough grinder in 1973 and he later became a welder. After being appointed Union Safety Officer in 1991, in May 1993, Complainant was elected president of the local chapter of the United Steelworkers of America (Union) and represented Employer's production employees. He served as Union president until May 1997. During that time, Complainant was safety officer and filed claims against the company with the National Labor Relations Board (NLRB), the Occupational Health and Safety Administration (OSHA), the United States Environmental Protection Agency, the Pennsylvania Department of Environmental Protection, as well as assisting other employees with filing employment-related claims with the Commission.

On March 6, 1998, Complainant was working as a first-shift welder which ended at 2:00 p.m. Employees, however, were permitted to quit working at 1:50 p.m. to clean up their work station and to take a shower. At about 1:25 p.m., Complainant was asked by another co-worker whether he would weld something for her. He did not. Instead, at around 1:30 p.m., Complainant was standing outside his welding booth when he was confronted by Employer's Vice President of Operations Jerry Kucharczyk (Vice President)[2] and Foundry Superintendent Ken Alexander (Superintendent). The Vice President asked Complainant if he was finished working for the day, and Complainant responded that he was because the piece in his welding booth was finished and he could not get access to the crane to move it. The Vice President told Complainant that he had at least 20 minutes left in his workday, and that he was required to go back to work until 1:50 p.m. Complainant returned to his booth and said "okay;" meanwhile, the Vice President and Superintendent continued with their inspection. Complainant did not return to work but instead left his station.

Sometime around 1:35, the Vice President and the Superintendent returned to Complainant's booth but he was not there. At around 1:40 p.m. (in any event, before 1:50 p.m.), Complainant was already in the shower room taking a shower. The Vice President and the Superintendent approached Complainant in the shower room and told him they wanted to see him in the office the following Monday. They told Complainant that he should bring a union steward with him. They gave the same instructions to another employee who was

---

1. Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963.

2. Kucharczyk began working for Employer as Director of Operations in July 1996, and six months later, he became Employer's Vice President of Operations. In that capacity, he was Employer's second-highest ranking official and highest ranking official in the foundry. As Vice President, Kucharczyk attempted to improve discipline and accountability among the workforce, including enforcing employees' starting and quitting times.

also taking a shower before 1:50 p.m. that same day.

The Vice President and Superintendent thereafter spoke to Employer's Director of Plant Facilities and Labor Relations (Director) to discuss Complainant's conduct, indicating that Complainant had disobeyed a direct order and quit work early. By doing so, Complainant violated two work rules: prohibiting insubordination and prohibiting quitting work early. Under Employer's policy, insubordination was an offense that could call for immediate dismissal.

That Monday (March 9, 1998), after several meetings attended by Complainant which always included the union steward (at times there were five other members of the Union), the Vice President, the Superintendent and the Director, Employer issued a verbal reprimand to Complainant for leaving work early in addition to a five-day suspension with the intent to discharge for insubordination for intentionally refusing an order of the Vice President to get back to work until 1:50 p.m. Complainant was told, however, that he would not be discharged if he admitted to having been insubordinate and complied with certain conditions. Complainant refused the offer. On March 12, 1998, Employer officially discharged Complainant.

Complainant and the Union filed a grievance pursuant to the Collective Bargaining Agreement (CBA) of the parties alleging that Complainant was wrongfully discharged in retaliation for Complainant's long history of opposing discriminatory practices committed by Employer and in retaliation for assisting employees with and participating in proceedings before various state and employment agencies, including the Commission. Complainant and the Union sought back pay and reinstatement of Complainant's position.

After a hearing, the Arbitrator found that just cause existed for Employer to discipline Complainant because he was insubordinate. The Arbitrator found that based on the credible testimony of the Vice President and Superintendent, Complainant stopped work 20 minutes early despite having been told by the Vice President to return to work; that Complainant failed to show he actually returned to work after his encounter with the Vice President; and that Complainant failed to show there was a pretext for charging him with insubordination or that the charge was retaliation for his activities in the Union and his prior activities of filing charges with agencies such as the NLRB, OSHA and the Commission, especially because Employer told Complainant he would not be fired if he simply acknowledged that his conduct was insubordinate.

Although the Arbitrator found that just cause existed to *discipline* Complainant, he concluded that *terminating* Complainant was excessive punishment because (1) there was never a termination for insubordinate conduct involving other employees, including other instances involving Complainant; (2) Complainant's act of quitting work early was not "sneaky" as claimed by Employer; (3) Employer lackadaisically enforced early quit rules; and (4) Complainant was fired while another employee in the shower at the same time as Complainant merely received discipline, which did not necessarily indicate "disparate treatment" of Complainant but indicated that Employer did not view early quits as *per se* reasons for termination or serious breaches of conduct.

Accordingly, the Arbitrator issued an order on December 18, 1998, concluding that Complainant was guilty of conduct justifying discipline; that Employer in good faith offered Complainant an opportunity to return to work (if he acknowl-

edged his misconduct); and that his refusal to acknowledge his misconduct resulted in termination. Because that termination was excessive under the circumstances, the Arbitrator reinstated Complainant with his seniority unimpaired, but did not award back pay because of Complainant's misconduct.

In the meantime, on August 12, 1998, Complainant filed a complaint with the Commission alleging violations of Section 5(d) the Act, which prohibits employers from retaliating against employees who file charges or otherwise engage in activity protected by the Act.[3] In particular, Complainant alleged that his termination was retaliation for his prior actions of filing complaints with the NLRB, OSHA and the Commission or assisting other employees to file such complaints. The Commission held public hearing on four separate dates.

■ Relying on stipulations of fact based in large part on the Arbitrator's findings and on new testimony presented at the hearings, the Commission concluded that Employer violated Section 5(d) of the Act by retaliating against Complainant for his participation in filing complaints with

employment agencies (such as the Commission) or assisting other employees to file such complaints.[4] The Commission stated that Complainant met his *prima facie* burden of proving that (1) he was engaged in protected activity because he participated in numerous Commission hearings and opposed practices that were unlawful under the Act; (2) Employer was aware of Complainant's protected activity based on testimony by Employer's management employees indicating that they physically saw Complainant at Commission proceedings; and (3) subsequent to participating in this protected activity, Complainant suffered adverse employment action by Employer because he was suspended and then discharged. While the Commission also found that Employer met its burden of proving that it had a legitimate, non-discriminatory reason for the action taken against Complainant because Employer's reason for discharging Complainant was insubordination, it found that a causal connection existed between Complainant's participation in protected activity and his ultimate discharge because Complainant had established causation and met its addi-

---

3. That section provides in pertinent part as follows:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

＊ ＊ ＊

(d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 P.S. § 955(a).

4. The test for retaliation under Section 5(d) is a shifting burden. The complainant has the initial burden of proving that (1) he or she engaged in protected activity; (2) the employer was aware of the protected activity; (3) after engaging in such activity, the complainant suffered adverse employment action; and (4) a causal connection between the participation in the protected activity and the subsequent adverse employment action. *Robert Wholey Co. v. Pennsylvania Human Relations Commission*, 146 Pa.Cmwlth. 702, 606 A.2d 982 (1992), *petition for allowance of appeal denied*, 532 Pa. 659, 615 A.2d 1314 (1992). The employer then bears the burden of proving a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden shifts back to the complainant to prove that such proffered reasons were merely pretextual. *Id.*

tional burden of proving that Employer's reason for the suspension and discharge (i.e., insubordination for disobeying the order to return to work) was merely pretextual because (1) while he may have been insubordinate, other employees charged with insubordination were never discharged or even suspended, and, unlike Complainant, none of these employees ever participated in or assisted others with Commission complaints or proceedings; (2) Complainant was the only employee discharged for a first-time insubordination offense; (3) Employer's management employees told Complainant that they were tired of all the Commission proceedings instituted by employees; and (4) following the protected conduct, there was a "pattern of antagonism" against Complainant.

Responding to Employer's argument that the facts as found by the Arbitrator were preclusive and binding on the Commission in making its decision on Complainant's retaliation claim, the Commission concluded that collateral estoppel was inapplicable. It found that the issue before the Arbitrator was whether just cause existed to discipline/terminate Complainant, which was not at issue before the Commission. The Commission found that it was not bound by any term in the CBA between the parties. The Commission also found that Complainant did not have a full and fair opportunity to litigate before the Arbitrator because he was represented by Joe Pozza (Union Steward), who had a

"stormy relationship" with Complainant, based in part on some animosity from the Union and members thereof in response to Complainant's charges of election fraud against the Union. Also, the Commission found that the Union Steward failed to present all existing evidence of retaliation before the Arbitrator and actually presented testimony painting Complainant as an "unreasonable zealot." Furthermore, the Commission found that the arbitration hearing was private, not public, and no transcript was taken of the hearing and no findings of fact in numbered form were actually made by the Arbitrator.

Consequently, the Commission ordered Employer to pay Complainant back pay, lost overtime pay and interest at various rates on those amounts. Employer now appeals that determination.[5]

## I.

### A.

Employer argues that all of the Arbitrator's factual findings [6] are conclusive and binding on the Commission under the doctrine of collateral estoppel, also known as issue preclusion. It argues that the Commission erred as a matter of law by refusing to give preclusive effect to the Arbitrator's factual findings and by making certain factual findings necessary to support its determination directly contrary to the Arbitrator's findings. Employer does not contend that Complainant

---

5. Our review is limited to whether the Commission violated constitutional rights, whether the Commission committed errors of law, or whether the necessary findings of fact made by the Commission are supported by substantial evidence. *Parks v. Pennsylvania Human Relations Commission,* 848 A.2d 204 (Pa.Cmwlth.2004).

6. Section 301 of the Labor Management Relations Act of 1947, 32 U.S.C. § 185, provided that suits may be brought to specific perform-

ance of collective bargaining agreements. "As the [House and Senate] Conference Report stated 'Once the parties made a collective bargaining contract, the enforcement of that contract should be left to the usual processes of law' ..." *Textile Workers of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 450, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). While not required, most collective bargaining agreements contained grievance arbitration provisions.

was precluded altogether from bringing his retaliation claim before the Commission; instead, Employer argues that the Commission was required to make its determination on the retaliation claim based on the facts as found by the Arbitrator.

The doctrine of collateral estoppel, or issue preclusion, applies where the following four prongs are met: (1) an issue of law or fact decided in a prior action is identical to one presented in a later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. *Rue v. K–Mart Corp.*, 552 Pa. 13, 713 A.2d 82 (1998). As our Supreme Court has explained:

> If the parties to an action have had an opportunity to appear and be heard in a prior proceeding involving the same subject matter, all *issues of fact* which were actually adjudicated in the former action and essential to the judgment therein are concluded as between the parties *even though the causes of action in the two proceedings are not identical.* *Larsen v. Larsen*, 392 Pa. 609, 612, 141 A.2d 353, 355 (1958); *Thal v. Krawitz*, 365 Pa. 110, 112, 73 A.2d 376 (1950); *In re Wallace's Estate*, 316 Pa. 148, 153, 174 A. 397 (1934).

*Pilgrim Food Products Company v. Filler Products, Inc.*, 393 Pa. 418, 422, 143 A.2d 47, 49 (1958) (emphasis added.) *See also Schubach v. Silver*, 461 Pa. 366, 377, 336 A.2d 328, 334 (1975) (stating that "for the doctrine of collateral estoppel to apply it must appear that the *fact or facts at issue* in both instances were identical; that these facts were essential to the first judgment and were actually litigated in the

first cause.") (Emphasis added.) RESTATEMENT (SECOND) JUDGMENTS § 27 ("When an *issue of fact* or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, *whether on the same or a different claim.*") (Emphasis added.)

■ Pennsylvania follows the predominant view among the states that unless the arbitral parties agreed otherwise, a judicially confirmed private arbitration award will have a collateral estoppel effect, even in favor of non-parties to the arbitration, if the arbitrator actually and necessarily decided the issue sought to be foreclosed and the party against whom estoppel is invoked had full incentive and opportunity to litigate the matter. *See Dyer v. Travelers*, 392 Pa.Super. 202, 572 A.2d 762, 764 (1990); *Ottaviano v. Southeastern Pennsylvania Transportation Authority*, 239 Pa.Super. 363, 370, 361 A.2d 810, 814; Restatement (Second) of Judgments § 84 (1982). This view is based on the general policy that the prohibition against relitigation of issues already decided causes no injustice when the party to be bound had a full and fair opportunity to litigate the issues to be foreclosed, and that "final" and "binding" arbitration necessarily implies the possibility of collateral estoppel, particularly when (as in California) the law gives judicially confirmed arbitration awards the force and effect of civil judgments. *Witkowski v. Welch*, 173 F.3d 192 (3rd Cir.1999) (arbitration award confirmed by federal district court is "final judgment" on the merits under FAA which can have issue preclusive effect under Pennsylvania law.)

■ In this case, it is not disputed (or at the very least, cannot reasonably be disputed by the Commission) that the Arbitrator's award was a final judgment on the

merits, satisfying the second element of the *Rue* test. Moreover, because Complainant was a party in privity with the Union (the actual party in interest before the Arbitrator) by virtue of his Union membership and because he was the grievant before the Arbitrator, the third element of *Rue* is satisfied. Accordingly, we must decide whether the "issue(s)" in the labor arbitration were identical to the issue(s) in the Commission's proceedings and whether Complainant had a full and fair opportunity to litigate those issue(s).

While the Commission argues that the issue in the arbitration proceeding was whether "just cause" existed to discharge Complainant as opposed to whether, in the Commission proceeding, Employer "retaliated" against Complainant for participating in protected activity, those are the legal issues presented by two different causes of action. However, the issues of fact essential to the arbitration award were the same as the issues of fact essential to the retaliatory claim before the Commission, regardless of the legal principles involved. As the Court in *Rue* stated:

> Although the Superior Court in the instant case correctly noted that the determination of whether Rue committed an act of willful misconduct for purposes of the Unemployment Compensation Law is far different from the determination of whether K–Mart made defamatory statements about her, *see Rue,* 456 Pa.Super. at 649, 691 A.2d at 502, those legal conclusions are not at issue here. *Cf. Bortz v. Workmen's Compensation Appeal Board,* 546 Pa. 77, 683 A.2d 259 (1996) (willful misconduct determination in unemployment proceeding differs from disability determination in workers' compensation proceeding.) Unlike *Bortz* and *Odgers[v. Unemployment Compensation Board of Review,* 514 Pa. 378, 525 A.2d 359 (1987)], the issue in this case is neither one of law, nor a

mixed question of law and fact. Instead, it is an issue of pure fact, concerning whether Rue did or did not steal a bag of potato chips. As such, the differences between the public policies of the Unemployment Compensation Law and the civil action for defamation are not relevant. A fact is a fact, regardless of public policy. Thus, we conclude that the first prong of the collateral estoppel test, identity of issues, is satisfied here.

*Rue,* 552 Pa. at 18–19, 713 A.2d at 85.

In this case, the facts necessary for a determination of whether just cause existed to discharge Complainant and the facts necessary to decide whether Employer retaliated against Complainant are exactly the same and have already been decided. The Arbitrator found, for example, that Complainant assisted other employees to file employment claims with various agencies, including the Commission; the Arbitrator found that Complainant quit work early; the Arbitrator found that Complainant disobeyed the Vice President's directive to return to work; the Arbitrator found that neither Employer nor its representatives wanted to retaliate against him for filing or helping to file employment claims with various agencies because they *offered him his job back;* and finally, for the same reason, the Arbitrator specifically found that Employer's proffered reason for taking action against Complainant was *not* a pretext for discrimination. These facts, along with the rest of the facts as found by the Arbitrator, were essential to his judgment and were essential to the judgment of the Commission. Consequently, the "identity of issues" prong of *Rue* is satisfied.

Having determined that the factual issues were identical in both proceedings, we turn to whether Complainant had a full and fair opportunity to litigate those issues

in the previous proceeding before the Arbitrator.[7] The Commission placed great emphasis on the fact that the Union Steward representing Complainant had a "stormy relationship" with Complainant and that Complainant had adverse interests to the Union at the time of the action before the Commission. The Commission also emphasized that the Union Steward representing Complainant did not do so adequately, according to Complainant. (Complainant actually testified that he believed that the Union Steward did a good job in representing him in getting his job back, but did not do a good job in getting him back pay.) Also, the Commission essentially stated that the Union Steward did not represent Complainant well, and that the proceedings before the Arbitrator were too informal for Complainant to adequately present his case.

Considering all these factors that the Commission relied upon in determining whether Complainant had a full and fair opportunity to litigate the factual issues before the Arbitrator, the Commission effectively asks us to find that no party has a full and fair opportunity to litigate for purposes of collateral estoppel unless (1) the party is represented by a lawyer; (2) the party is subjectively satisfied with the lawyer's representation; (3) the forum in both proceedings were procedurally identical; and (4) both proceedings were sufficiently "formal" to litigate a claim. Under the Commission's rule, for example, neither a *pro se* litigant nor a party to a labor arbitration represented by a union steward could ever be collaterally estopped.

Similarly, any litigant who loses could never be collaterally estopped because he would obviously and subjectively believe the lawyer was at fault for not representing his interest adequately. Moreover, because various forums (i.e., courts, agencies, arbitrators, etc.) invariably have their own procedural quirks, local procedural rules, internal operating procedures, and the like, the "full and fair opportunity" element could never be met because no two forums employ the exact same procedures. In short, the Commission's view of the "full and fair opportunity" element is absolutely unrealistic.

Moreover, contrary to the Commission's assertion,[8] the record reveals that Complainant had more than a full and fair opportunity to present the factual issues necessary for a favorable determination before the Arbitrator. Complainant was represented by the Union Steward who filed a nine-page brief zealously arguing Complainant's position. (Reproduced Record at 382a–390a.) Complainant submitted his own testimony and that of five other witnesses, under oath, with the full ability of cross-examination of all witnesses presented by Employer. Additionally, all remedies sought by Complainant were readily available in the event he succeeded on his claim. Further, the procedures and procedural safeguards ensuring fairness and adequate representation were available to Complainant. To illustrate, Complainant had the ability to request subpoenas for documents before the hearing and he had the ability to file and participate in

---

7. Because it was not raised, we do not address whether that has to be done in the proceeding to confirm the Commission has jurisdiction to determine that the proceeding is unfair or that has to be done in the proceeding to confirm the award. *See* 42 Pa. C.S. § 7313; 9 U.S.C. § 9.

8. The Commission contended that, among other things, Complainant was not adequately represented by the Union Steward based on Complainant's own testimony. However, Complainant's friend and witness testified that Complainant was satisfied with the Union Steward's representation and said he did a "good, thorough job" of representing him before the Arbitrator.

the preparation of post-hearing briefs. Aside from those procedures, the arbitration was subject to all statutory procedural protections set forth in the Pennsylvania Judicial Code; see 42 Pa.C.S. § 7342 (applying various statutory procedural safeguards to labor arbitrations); 42 Pa.C.S. § 7309 (relating to witness, subpoenas, oaths, depositions). Finally, the Arbitrator, after "winnowing and sifting," issued a principled decision.[9]

## B.

Even if he received a "fair and full hearing," the Commission contends that preclusive effect should not be given to arbitration awards under the United States Supreme Court's holding in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), that discrimination issues decided through labor arbitration cannot preclude an employee from pursuing statutory remedies prohibiting discrimination. In that case, the employee filed a grievance after he was discharged alleging, among other things, that he was subject to racial discrimination in violation of the collective bargaining agreement's prohibition of racial discrimination. The arbitrator ruled that the employer had just cause for terminating the employee, finding no discrimination. In the concomitant action filed under Title VII of the Civil Rights Act of 1964 for unlawful discrimination, the United States Supreme Court, responding to an argument similar to the one posed by Employer in this case, held that the employee's statutory right to trial *de novo* under the Equal Employment provisions of the Civil Rights Act was not completely foreclosed by a prior submission of a claim to final arbitration under the non-discrimination clause of a collective bargaining agreement.

Because it found that Congress had granted aggrieved employees access to the courts, and because contractual grievances and arbitration procedures provided an inadequate forum for enforcement of Title VII rights, the Supreme Court reversed, holding that no preclusive effect should be given to an arbitrator's award. It reasoned that Congress did not intend for a labor arbitrator to have preclusive effect because (1) an arbitrator's expertise "pertains primarily to the law of the shop, not the law of the land." 415 U.S. at 57, 94 S.Ct. 1011; (2) because an arbitrator's authority derives solely from the contract, "The arbitrator ... has no general authority to invoke public laws that conflict with the bargain between the parties.... If an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced," 415 U.S. at 53, 94 S.Ct. 1011, quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); (3) because the union usually has exclusive control over the manner and extent to which an individual grievance is presented and the union's interests and those of the individual employee are not always identical or even compatible causing the union to present the employee's grievance less vigorously, or make different strategic choices, than would the employee, 415 U.S. at 58, n. 19, 94 S.Ct. 1011; and (4) evidencing hostility to arbitration in general, it held that arbitral factfinding is generally

---

9. We also note that Complainant never attempted to appeal the award of the Arbitrator or attempt to have the award vacated for breach of the Union's duty of fair representation. This issue of inadequate representation was raised for the first time before the Commission.

not equivalent to judicial factfinding because "[t]he record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable." 415 U.S. at 57–58, 94 S.Ct. 1011.

The Supreme Court's hostility to arbitration began to shift 17 years later in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The employee in that case was hired by the defendant/employer as a manager of financial services. As a condition of his employment, the employee was required to register as a securities representative with several stock exchanges, including the New York Stock Exchange (N.Y.SE). The NYSE registration application included a provision by which the employee agreed to arbitrate any claim which arose between him and his employer and which was required to be arbitrated under exchange rules. NYSE Rule 347 provided for arbitration of any controversy between a registered representative and a member organization arising out of the representative's termination of employment. The employer terminated the employee in 1987; at the time, the employee was 62 years of age. After filing a charge of discrimination with the EEOC, the employee filed suit against his employer in federal court alleging violations of the Age Discrimination in Employment Act (ADEA). The employer moved to compel arbitration of its employee's claim and the district court, citing *Alexander,* denied the motion. Relying on the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* the Supreme Court held that the employee was obligated to arbitrate his claim that his discharge violated the ADEA. In so holding, the Court rejected the employee's arguments that compulsory arbitration of ADEA claims was inconsistent with the statutory framework and purposes of the ADEA, that arbitration would undermine the role of the EEOC in enforcing the ADEA, and that compulsory arbitration deprived claimants of the judicial forum provided by the ADEA. Further, the Court rejected various challenges raised by the employee to the adequacy of arbitration procedures. The Court rejected the employee's reliance on *Alexander,* specifically concluding *Alexander* and its progeny were factually distinguishable from the employee's situation:

> First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements." Therefore, those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim. Id. at 35, 111 S.Ct. at 1657 (internal citation omitted).

666

Based on that reasoning, it has been held that federal law can have a preclusive effect on administrative agency actions. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (holding that claims of discrimination arising under statute such as the Federal Civil Rights Act can be decided by arbitration); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (statutory claims of discrimination can be arbitrated under the Federal Arbitration Act).

The remaining vestige that a labor arbitration award will not be given preclusive effect began to erode where the Supreme Court held that grievance-arbitration may have some preclusive effect on an employee's statutory right, but only if the waiver of the employee's statutory rights is "clear and unmistakable." *Wright v. Universal Maritime Serv. Corporation,* 525 U.S. 70, 80, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998).[10] Interpretation of federal law by federal courts, while in some instances helpful, does not control whether preclusive effect should be given to a labor arbitrator's decision to an adjudication pursuant to the Pennsylvania Human Relations Act (PHRA).

While the federal case law has a rich, varied and shifting history of the preclusive effect of arbitration awards on federal courts and agencies involving federal statutory rights and agencies, Pennsylvania courts have never squarely addressed whether an arbitration award will be given preclusive effect to proceedings before state agencies. In *Driscoll v. Carpenters Dist. Council of Western Pennsylvania,* 525 Pa. 205, 579 A.2d 863 (1990), though, our Supreme Court addressed an analogous situation. In that case, at issue were discriminatory practices in the operation of a labor union hiring hall. The Court held that the PHRA was not preempted by the National Labor Relations Act (NLRA) which was not the exclusive forum for claims of employment discrimination by a labor union employee who was free to proceed under Title VII as well as under the PHRA.[11] More recently, in *Bortz v. Workmen's Compensation Appeal Board (Reznor Div. of FL Industries),* 546 Pa. 77, 683 A.2d 259 (1996), our Supreme Court held that a decision of the Unemployment Compensation Board does not have preclusive effect on a workers' compensation decision because every administrative agency in the Commonwealth is charged with enforcing its own acts which have different purposes; therefore, one agency's hands would be tied by the findings and conclusions of another without being allowed to make independent findings and conclusions and applying its own expertise to the facts. Because labor arbitrations are akin to "private administrative agencies" and the Commission is charged (unlike the Equal Employment Opportunities Agency) with adjudicating claims under the PHRA, 43 P.S. § 957(g), the General Assembly did not intend any arbitration award to have a preclusive effect on claims of discrimination brought pursuant to the PHRA.[12]

10. The collective bargaining contract between Frog Switch and the United Steelworkers is not part of the Record.

11. *See* Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.;* NLRA, *as amended,* 29 U.S.C. § 151 *et seq.*

12. When the General Assembly wants to allow arbitration as an alternative remedy, it has said so. Section 450 of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 1000.6(a), provides that "[a]ny employer and the recognized or certified and exclusive representative of its employe may agree by collective bargaining to establish certain binding obligations and procedures relating to workers' compensation: Provided, however, that the scope of the

## II.

■ Even if no preclusive effect is given to labor arbitration, Employer contends that agency's fact finding is flawed because it capriciously disregarded overwhelming critical evidence that could have compelled a different conclusion. An agency capriciously disregards competent evidence when it arrives at a decision where the losing party has presented overwhelming evidence that could require the agency to arrive at a different outcome that the agency has not addressed by resolving critical conflicts in the evidence or make essential credibility determinations. *See generally Leon E. Wintermyer v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812 A.2d 478 (2002). In *Hinkle v. City of Philadelphia*, 881 A.2d 22 (Pa.Cmwlth.2005), we explained that the capricious disregard standard enunciated in *Wintermyer* was a shorthand way of addressing various statutory and constitutional requirements that required an agency to give reasons for its decision, and when an agency ignored critical overwhelming evidence that constituted an abuse of discretion requiring the decision to be vacated, the agency had to explain its action and arrive at a new decision if it so desired. Because an agency has so much discretion when enforcing its statute, capricious disregard, like abuse of discretion, will only be applied in rare instances when the agency palpably has failed to give a proper explanation of overwhelming critical evidence. This is one of the extremely rare cases where the threshold has been reached because in each and every key finding of causation, it ignored evidence that would have compelled a different conclusion. Specifically:

· The Commission found based solely on Complainant's testimony that at the

March 9, 1998 meeting, Vice President Kucharczyk, coupled his offer to Complainant of returning to work if he would admit insubordination and would no longer assist in filing PHRC complainants. In making that factual conclusion, it failed to address statements of Vice President Kucharczyk and Superintendent Gribble who denied such a statement was made; that Complainant's statement was inconsistent with his testimony at the Unemployment Compensation Hearing, and that at the Arbitration Hearing he stated that he was being retaliated against for filing charges with OSHA or the NLRB.

· The Commission found that the five other comparable employees charged with insubordination were not discharged but failed to address uncontroverted evidence of the difference in disciplinary history, the level of insubordination, and mitigating factors such as accepting responsibility for their conduct. It also did not address in finding disparate treatment that other employees were also suspended pending discharge but were not terminated when they admitted their insubordination.

· In making its analysis, it did not address that those employees were not insubordinate to supervisors, a vice president and plant superintendent. (It is much different to be insubordinate to a corporal than to a general.)

· While Complainant was the only employee who had been terminated the first time he had been guilty of insubordination, it was ignored that Complainant had been suspended before for insubordination and only one other employee had more than one charge.

· The Commission found that there was a "pattern of antagonism" based on

agreement shall be limited to: ... (2) an alternative dispute resolution system which

may include, but is not limited to, arbitration, mediation and conciliation.''

Complainant's sole statements that "I was held accountable for everything I did at Frog and Switch. Sort of like I was the rabbit waiting for the dog to jump on me in hunting season. Everything I did was called into question. Any time I was anywhere, going to the bathroom or anything, I was followed and timed, wrote up for how long I went to the bathroom, I take my breaks too early, I leave work too early." Yet, the Commission did not comment on the lack of any evidence that any "writing" up had occurred and it did not address that his complaints began prior to his assisting others in filing of PHRA complaints.

Because there was a capricious disregard of overwhelming evidence that could have resulted in a contrary outcome, we order this matter back to the Commission to reconsider its decision by conducting a proper "winnowing and sifting" of the evidence, not the one-sided review it conducted here. Accordingly, the decision of the Commission is vacated and the matter remanded to the Commission to address the above in a new fact-finding proceeding consistent with this opinion.[13]

## ORDER

AND NOW, this *27th* day of *October,* 2005, the order of the Commission in the above-captioned matter is vacated and the matter remanded to the Commission for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

## DISSENTING OPINION BY Judge LEADBETTER.

I must respectfully dissent. I believe the majority has read both *Driscoll*[1] and *Bortz*[2] too broadly in holding that factual findings of one agency (or, here an arbitrator) cannot have preclusive effect in subsequent proceedings before another agency. As the majority explains, *Driscoll* involved the issue of preemption, not preclusion. The court rejected the preemption claim, holding that "where a plaintiff's claims of discrimination constitute an unfair labor practice, the claimant has the option of proceeding under *either* Title VII [and therefore also under the Pennsylvania Human Relations Act] *or* the [National Labor Relations Act]." *Driscoll,* 525 Pa. at 214, 579 A.2d at 868 (emphasis in original). It did not even say that successive proceedings under both acts were permissible, let alone that in the event of multiple actions the doctrine of issue preclusion would not apply.

In *Bortz,* the question was whether a finding of willful misconduct in unemploy-

---

**13.** In addition, Employer argues that (1) the Commission committed an error of law by failing to find that Complainant's refusal to accept an offer of an appropriate remedy that required the Commission to dismiss his complaint under Section 9 of the Act, 43 P.S. § 959(c.1); (2) the Commission committed an error of law by concluding that Complainant satisfied his burden of proving a causal connection between his known protected activity and his discharge; (3) the Commission committed an error of law by concluding that Complainant satisfied his burden of proving that the stated reason for his suspension and discharge was pretextual; (4) the Commission committed an error of law by concluding that there was insufficient evidence to establish Complainant's failure to mitigate his damages; and (5) the Commission committed an error of law by awarding interest on the back pay award at a rate of interest in excess of 6% per annum. Because we have remanded the matter to the Commission, we need not address these issues.

1. *Driscoll v. Carpenters Dist. Council of W. Pa.,* 525 Pa. 205, 579 A.2d 863 (1990).

2. *Bortz v. Workmen's Comp. Appeal Bd.(Reznor Div. of FL Indus.),* 546 Pa. 77, 683 A.2d 259 (1996).

ment compensation proceedings precluded a Workmen's Compensation Judge from reinstating disability benefits. The court did not hold the doctrine of preclusion inapplicable, but only that the issue of misconduct was irrelevant "in the workmen's compensation arena, [where] there is no conduct standard as such. Given this, collateral estoppel does not apply in the instant case because there is no identity of the issues." *Bortz*, 546 Pa. at 82, 683 A.2d at 262 (citations omitted).

Here, the majority has thoroughly and accurately demonstrated that all the elements of collateral estoppel/issue preclusion, including identity of issues, have been satisfied. Accordingly, I would hold that the Arbitrator's factual findings were binding upon the Commission and, therefore, I would reverse.