**DAIRYLEA COOPERATIVE INC.; Dairy Farmers of America, Inc.; Land O'Lakes, Inc.; Maryland and Virginia Milk Producers Cooperative Association, Inc.; Dairy Marketing Services, LLC; and Upstate Niagra Cooperative, Inc., Petitioners**

v.

**PENNSYLVANIA MILK MARKETING BOARD, Respondent.**

**Edward G. Rendell, Governor of the Commonwealth of Pennsylvania and Dennis C. Wolff, Secretary of Agriculture of the Commonwealth of Pennsylvania, Petitioners**

v.

**Pennsylvania Milk Marketing Board, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 17, 2010.

Decided Aug. 6, 2010.

Reargument Denied Oct. 1, 2010.*

---

Marvin Beshore, Harrisburg, for petitioners, Dairylea Cooperative Inc.; Dairy Farmers of America, Inc.; Land O'Lakes, Inc.; Maryland and Virginia Milk Producers Cooperative Association, Inc.; Dairy Marketing Services, LLC; and Upstate Niagra Cooperative, Inc.

D. Holbrook Duer, Chief Counsel, Harrisburg, for petitioner, Commonwealth of PA.

Douglas L. Eberly, Chief Counsel, Harrisburg, for respondent.

George A. Bibikos, Harrisburg, for intervenor, PA Association of Milk Dealers.

Kevin M. Lutkins, Wormleysburg, for intervenor, PA Food Merchants Association.

\* Leavitt, J., did not participate in the decision.

Wendy M. Yoviene, Washington, DC, for amicus curiae, Northeast Dairy Foods Association, Inc.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, SIMPSON, Judge, BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge McGINLEY.

Governor Edward Rendell and Dennis Wolff, Pennsylvania Secretary of Agriculture, the Pennsylvania Farm Bureau and a consortium of dairy cooperatives representing a majority of the dairy farmers in Pennsylvania, including Dairylea, Inc., Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, Land–O'–Lakes, Inc., Maryland and Virginia Milk Producers Cooperative Association, Inc. and Upstate Niagara Cooperative, Inc. (collectively referred to hereinafter as "Petitioners") petition for review from the Adjudication and Order of the Pennsylvania Milk Marketing Board (Board) entered April 1, 2009.

*Milk Marketing Law*

Section 301 of the Pennsylvania Milk Marketing Law (MML)[1], 31 P.S. § 700j–301, vests the Board with the authority and duty to "supervise, investigate and regulate the entire milk industry of this Commonwealth ... including the establishment of reasonable trade practices, systems of production control and marketing area committees in connection therewith...." The Legislature declared the Board to be an instrumentality of the Commonwealth for the purpose of administering the provisions of the MML and to execute its legislative intent. 31 P.S. § 700j–301.

Section 801 of the MML establishes the authority of the Board to hear petitions. It states the Board can "upon its own motion or upon application in writing ... alter, revise or amend an official order defining milk marketing areas or fixing prices to be charged or paid for milk...." 31 P.S. § 700j–801. Section 801 requires the Board to "base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to producers, which return shall not be less than the cost of production and a reasonable profit to the producer". 31 P.S. § 700j–801. Section 803 of the MML establishes the Board's authority to fix the prices paid to producers by dealers.[2] It states, "[t]he board shall fix, by official order, the minimum prices or a formula for the setting of minimum prices to be paid by milk dealers or handlers to producers for milk or milk components sold or delivered or made available on consignment or otherwise by producers to dealers or handlers." 31 P.S. § 700j–803.[3]

Section 804 of the MML authorizes the Board to fix prices for various grades of milk and for such prices to vary in different markets and may apply to the area where the milk is produced, manufactured or delivered. 31 P.S. § 700j–804. Section 806 vests the Board with the authority to "fix by official order, the terms upon which

---

1. Act of April 28, 1937, P.L. 417, *as amended.*

2. Milk "dealers or handlers" refer to persons who receive milk for processing or manufacture and further sale; for example, a cheese manufacturer or a grocery store. 31 P.S. § 700j–103. Milk "producers" refer to Pennsylvania dairy farmers.

3. The Board has developed a three-tiered system of minimum prices: (1) minimum producer prices applicable to raw milk purchases, which is the subject of this controversy; (2) minimum wholesale prices applicable to sales by processors to distributors or retailers; and (3) minimum retail prices applicable to sales to consumers.

milk dealers shall pay producers and others for milk, may prescribe the method of computing payment therefore, and may prescribe a form of written statement to be sent to producers with each payment." 31 P.S. § 700j–806. Finally, Section 808 of the MML states the legislative intent with regard to the Board's authority to price milk produced in Pennsylvania and shipped into another State for ultimate sale. It states it is the "legislative intent that the prices prescribed by the Board for milk produced in this Commonwealth, and sold or delivered ... into and ultimate sale in another state, shall not be destructive of the price structure of producers in such other state." 31 P.S. § 700j–808.

This controversy concerns the Petitioners' appeal to the Board to fix the price of milk and impose an "over order premium" on milk produced and processed in Pennsylvania and sold to milk dealers *in New Jersey.*

### Over–Order Premium

In Pennsylvania, milk produced, processed and sold within the state receives a premium above the current federal order milk price. *If milk is processed or retailed in another state, the producer does not receive the premium.*

The term "over-order premium" refers to an amount to be paid by milk dealers to dairy farmers for milk over and above the federally established minimum price. It has been in place since 1988 and is generally reviewed twice annually, and has been adjusted up and down by the Board in response to all conditions affecting the milk industry.

### Petitioners' Proposal

On July 6, 2007, the Board was petitioned to extend the scope of its "over-order pricing" regulation to include milk produced on Pennsylvania dairy farms, processed by Pennsylvania milk dealers and sold as packaged Class I fluid milk [4] in those adjoining states with a state-mandated premium.[5] Specifically, Petitioners sought to impose and collect an "over-order premium" on Pennsylvania produced and processed milk sold to processors, wholesalers and retailers, i.e., dealers, *in New Jersey.* Petitioners requested that the premium be equal to the Pennsylvania's "fuel adjuster premium," not to exceed the New Jersey fuel adjustment premium.

At the time the Petition was filed, those volumes of milk produced and processed in Pennsylvania and sold *in New Jersey* were not subject to an over-order premium. The over-order premium was, by regulation, calculated only on milk produced and processed in Pennsylvania and sold *in Pennsylvania.* If accepted, the proposal would for the first time expand the over-order premium beyond milk produced, processed and sold *in Pennsylvania* to milk sold *outside of Pennsylvania.* Petitioners argued that the expansion of the Board's over-order premium was necessary to assure Pennsylvania producers "the cost of production and a reasonable profit to the producer" as required by Section 801 of the MML, 31 P.S. § 700j–801. Petitioners contend that dairy farmers were not receiving the cost of production plus a reasonable profit under the Board's current price-fixing scheme. The mandatory premium they proposed, if im-

---

4. Class I milk refers to milk that is used for fluid purposes (drinking).

5. New Jersey is the only contiguous (neighboring) state with a state-mandated over-order producer price. Accordingly, the Petition, hearings and analyses were limited to milk sold in New Jersey.

plemented, would capture and subject substantial additional quantities of Pennsylvania produced milk to mandated premiums. That, in turn, would provide Pennsylvania producers with additional income.

The Petition was opposed by the Pennsylvania Association of Milk Dealers and the Pennsylvania Food Merchants Association ("Milk Dealers"). The Milk Dealers contested the proposal because they believed the proposed premium would have adverse competitive consequences on Pennsylvania milk dealers.

Hearings were held over four days and the Board received testimony from numerous expert and lay witnesses.

*Petitioners' Witnesses*

Petitioners presented four expert witnesses and one dairy farmer witness. Three expert witnesses, Edward Gallagher (Gallagher), Dennis Schad (Schad) and Michael Evanish (Evanish), opined that dairy farmers in Pennsylvania need more income to maintain their livelihoods and asserted that the Board should adopt the proposed premium to price exports to New Jersey as a means to increase additional income. Petitioners presented extensive evidence of the market conditions which affect Pennsylvania producers, including their current and future costs of production and projections as to the prices they would receive for milk if the proposed over-order premium was not in place.

Gallagher, Vice President of Economics and Risk Management for Dairylea Corporation, testified that dairy farmers are paying significantly more for feed than they were two years ago. Notes of Testimony, March 14, 2008 (N.T., 3/14/08), at 35; Reproduced Record (R.R.) at 428a. Gallagher's testimony summarized world and domestic market pressure and policies which have impacted the dairy industry. N.T., 3/14/08, at 31–34, 39; R.R. at 424a–

427a; 432a. He opined that dairy farmers "need to derive additional income to assist them in managing through low milk prices, high production costs and the milk price uncertainty inherent in the global marketplace." N.T., 3/14/08, at 40; R.R. at 433a. Gallagher believed that by expanding the over-order premium to milk sold in New Jersey and increasing milk prices, the Board "can assist in improving dairy farmer income and in reducing the financial risks inherent in dairy farming." N.T., 3/14/08, at 40; R.R. at 433a.

The Board heard testimony from Schad, an expert in agricultural economics and marketing, who tracked the economic conditions of dairy farmers from 1998 to the present. Schad predicted, based on the trends he described, a decrease in milk price levels. N.T., 3/14/08, at 127; R.R. at 520a. He, like Gallagher, opined that the expansion of the over-order premium would guarantee Pennsylvania dairy farmers adequate income.

Evanish, an expert in dairy farm accounting and financial business analysis employed by the Pennsylvania Farm Bureau, testified that the costs of production were rising faster than increases in milk prices. N.T., 3/14/08 at 191–194; R.R. 584a–587a. He opined that the current milk regulations were not meeting the price needs of the average Pennsylvania dairy farmer. N.T., 3/14/08, at 189–190; R.R. at 582a–583a.

Petitioners' final expert was David DeSantis (DeSantis) who was offered as an expert in milk marketing law. DeSantis explained how to calculate the expanded premium and the amount of additional mandatory premium dollars that could be returned to Pennsylvania dairy farmers if the premium was implemented.

*Milk Dealers' Witnesses*

The Milk Dealers presented the testimony of Todd Rutter (Rutter), President of

Dairy Division, Rutter's Dairy, who testified from the perspective of a New Jersey dealer/processor which would be required to pay the additional over-price premium. He explained that competition in the milk industry is to the "tenth and hundredths of a cent per unit." N.T. 3/14/08, at 298; R.R. at 691a. He believed that if he raised his price up a tenth of a cent per gallon to meet the over-price premium, he would lose most of his New Jersey business within 30 days because he would become uncompetitive with other milk sources that do not have to deal with the additional premium. N.T., 3/14/08, at 306; R.R. at 699a. Rutter also candidly explained that he would attempt to circumvent the proposed mandated premium by procuring milk from outside of Pennsylvania which was not subject to the state regulated premiums. N.T., 3/18/08, at 338; R.R. at 731a.

Tom Mullery (Mullery), Vice President of Clover Farms Dairy in Reading, Pennsylvania, similarly testified from the perspective of a dealer/processor that the milk market is extremely competitive with "pricing down to five decimals." Notes of Testimony, March 27, 2008 (N.T., 3/27/08), at 13; R.R. at 749a. He testified that 100% of the milk Clover Farms Dairy purchased is from Pennsylvania with about 50% sold in New Jersey and New York to distributors. He stated that the proposed premium would add five to six cents a gallon increase which he would have to charge his distributors. He would lose business because those distributors could simply buy from another dairy company in New Jersey, Ohio or Maryland not subject to the premium. N.T., 3/27/08, at 35; R.R. at 771a. In fact, he noted that a customer had informed Clover Farms that if the over-order premium went into effect, it would take its volume to a plant other than a Pennsylvania plant because the premium would make Clover Farms uncompetitive.

N.T., 3/27/08, at 42; R.R. at 778a. Mullery explained that if that happened, Clover Farms would be forced to lay off farmers and employees.

Carl Herbein (Herbein), testified on behalf of the Milk Dealers as an expert in the area of cost accounting and milk cost accounting. Herbein testified that the proposed over-order premium would not result in any additional revenue to Pennsylvania dairy producers. N.T., 3/27/08, at 221–222; R.R. at 957a–958a. Herbein explained that money "is fungible." N.T., 3/27/08, at 231; R.R. at 967. He stated that Pennsylvania dealers were already paying a "voluntary premium" over and above the Board mandated over-order premium. He explained that "Bulletin 1376" which came into effect in 2005, was issued by the Board as advice to the regulated community regarding how Board Staff would treat payments labeled as "voluntary premiums" for purposes of determining whether minimum producer prices were paid by dealers. Simply stated, payments to producers labeled as some type of voluntary premium would not be included if Board Staff determined a dealer had paid a producer the minimum amount due.

Herbein testified that the level of existing voluntary overpayments could in the future simply be renegotiated or relabeled by milk processors to qualify as the expanded premium so that the expanded premium would have no impact on Pennsylvania producers. In other words, Pennsylvania dealers would decrease voluntary premiums to offset the increase in the expanded premium resulting in no net effect.

Herbein also conducted a study of ten Pennsylvania dealers that sold milk into New Jersey from January 2005 to October 2007. He analyzed product sales data and producer payment information and calculated the amount of additional over-order

premium costs that would be incurred by each dealer for each month based on actual sales to New Jersey. N.T., 3/27/08, at 218–222; R.R. at 954a–958. He testified that plants physically located in Pennsylvania could be placed at a competitive disadvantage to plants located in New Jersey because the premium would make Pennsylvania's raw milk costs higher than its New Jersey competitor's. N.T., 3/27/08, at 223–224; R.R. at 959–960.

### The Board's Adjudication and Order

On April 1, 2009, the Board issued its Adjudication and Order and indicated that it would not extend the over-order premium to Pennsylvania produced milk processed and sold in New Jersey. Board members were not persuaded that adopting the proposal would benefit for Pennsylvania producers. The Board rejected the Petition and found that "Pennsylvania dealers will either lose New Jersey business due to their increased costs, thus adversely affecting Pennsylvania producers, or adjust existing voluntary premiums so that they can keep their New Jersey business but at the expense of providing any net increase to producer income." Adjudication, April 1, 2009, Finding of Fact (F.F.) No. 66 at 14.

To that end, the Board accepted as credible the testimony of the Milk Dealers' witnesses, noting that the testimony of the milk processors was the only testimony before the Board that provided direct, first-hand experience from those who were actually competing for packaged milk sales to distributors and retailers in New Jersey. The Board also accepted as credible the expert opinion of Herbein.

### I.

### *Whether the Board Capriciously Disregarded Evidence of Market Conditions*

On appeal[6], Petitioners raise three issues. First, they contend that the Board failed to comply with its statutory mandate to assure a reasonable return to producers and to assure an adequate supply of milk to consumers. They contend the Board "capriciously disregarded" substantial evidence related to the current and projected future market conditions. This testimony, according to Petitioners, conclusively established that Pennsylvania producers have not received a Board mandated price that covered their "cost of production and a reasonable profit" as required by Section 801 of the MML, 31 P.S. § 700j–801.

Petitioners argue that despite their uncontradicted evidence that Pennsylvania producers faced rising production costs and price volatility, the Board gave it no weight in its decision when it concluded that implementation of the Petition would likely cause Pennsylvania producers to be in a worse situation because either of two things might happen: (1) dealers may lose New Jersey business, and lay off Pennsylvania producers, and (2) Pennsylvania dealers may adjust voluntary premiums at the expense of providing a net increase to producer income. Petitioners assert that had the Board properly considered the evidence they presented, it could have only resulted in a finding in favor of Petitioners.

This Court has reviewed the voluminous record and the Board's Adjudication and is

---

**6.** The appellate standard for reviewing an agency decision is provided under Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704. This Court must affirm the Board's adjudication unless it finds that the adjudication violates constitutional rights, is not in accordance with law, violates the practice and procedure of Commonwealth agencies, or that a finding of fact necessary to support the adjudication is not supported by substantial evidence.

satisfied that the Board gave equal consideration to the interests of (1) the producers of milk, (2) the transporters, processors, sellers of dairy products, and (3) the consuming public.

Petitioners suggest that the Board was required to accept their proposal carte blanche without considering the ramifications of the expanded premium on the remaining segments of the dairy industry. Petitioners' evidence focused primarily on conditions affecting only one segment of Pennsylvania's dairy industry, i.e., the milk producers. The Board, in contrast, and in keeping with its statutory duty under the MML, based its decision on *all* segments of Pennsylvania's dairy industry.

In *Finucane v. Pennsylvania Milk Marketing Board,* 150 Pa.Cmwlth. 319, 615 A.2d 936 (1992), this Court observed that Section 801 of the MML, 31 P.S. § 700j–801,

authorizes the Board to set prices paid to milk producers which *will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to the inhabitants of the Commonwealth.... The prices set by the Board shall be based upon all conditions affecting the milk industry.*

*Finucane,* 615 A.2d at 937 (Emphasis added). This Court went on to observe that Sections 801 and 803 of the MML vest the Board with broad discretion in setting milk prices and in the method of determining those prices. *Id.*

■ Where there is substantial evidence to support an agency's factual findings, and those findings in turn support the conclusions, "it should remain the rare instance in which an appellate court would disturb an adjudication upon capricious disregard." *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board*

*(Marlowe),* 571 Pa. 189, 203 n. 14, 812 A.2d 478, 487 n. 14 (2002). Specifically, because an agency has great discretion when enforcing its statute, capricious disregard, like abuse of discretion, will be applied only in rare instances where the agency palpably failed to give a proper explanation faced with overwhelming critical evidence. *Frog and Switch & Mfg. Co. v. Pa. Human Relations Commission,* 885 A.2d 655, 667 (Pa.Cmwlth.2005).

■ Here, there is nothing in the record and the Adjudication that suggests the Board capriciously disregarded Petitioners' evidence. The Board considered the substantial evidence offered by the Milk Dealers and weighed that evidence against that offered by Petitioners. The Board concluded that despite the market conditions, the Board-mandated over-order premium should not be expanded to include a fuel adjuster based on New Jersey sales *because of the threat to Pennsylvania producer markets.* It further concluded that the proposed expanded premium *would not have the desired effect of benefitting Pennsylvania dairy farmers.*

There was substantial credible testimony from Herbein, Rutter, Mullery and other Milk Dealer witnesses to support these findings. For example, Rutter testified credibly about how an additional premium would induce Rutter's Dairy to change its milk purchasing decisions if the premium had the effect the Petitioners intended. Rutter had first-hand experience in the New Jersey market and a firm understanding of his milk supply situation. Rutter explained that the expanded premium would raise his costs and render him uncompetitive in New Jersey. He further explained he could easily substitute Maryland milk for Pennsylvania milk if the premium was implemented so as to maintain his competitiveness. This Court must con-

clude that the Board properly exercised its judgment and expertise in choosing to believe that this would indeed occur thereby rendering the expanded premium incongruous.

In the end, the Board accorded greater credibility and weight to the Milk Dealers' witnesses than it did to Petitioners' witnesses. There is no indication that the Board rejected or ignored evidence of market conditions. Rather, it is obvious that the Board considered the consequences of the expanded premium on the dairy industry and concluded that it was not a practical or prudent solution and would actually harm the industry. Contrary to Petitioners' arguments, this did not constitute a capricious disregard of evidence, but was simply the Board acting within its expertise and performing its role as factfinder.

Accordingly, Petitioners' first issue is without merit.

## II.

### Whether the Board Erroneously Relied on Less than Substantial Evidence

Next, Petitioners contend that the Board erred when it relied on the Milk Dealers' witnesses whose testimony they describe as subjective in nature, and full of innuendo and conjecture.

Petitioners argue that the opinion of the Milk Dealers' expert witness, Herbein, upon whom the Board relied, was dependent on a misapprehension of material facts and was irrational. Petitioners argue that Herbein failed to include "Board Bulletin 1376" in his analysis which led him to grossly exaggerate the amount of over payments made by the dealers. They contend that the Board abused its discretion in finding his testimony credible and using it to conclude that no additional premiums would actually flow to Pennsylvania producers if the premium was implemented.

Again, the resolution of conflicts in the evidence and determinations as to witness credibility and evidentiary weight were within the exclusive discretion of the agency, as administrative fact finder, and are not matters for this Court. *Pennsylvania Game Commission v. Pennsylvania Department of Environmental Resources*, 97 Pa.Cmwlth. 78, 509 A.2d 877, *affirmed*, 521 Pa. 121, 555 A.2d 812 (1989). When, as here, an issue is technical and within the Milk Marketing Board's expertise, this Court will not disturb its finding on appeal as long as the findings are supported by substantial evidence. *School District of Philadelphia v. Milk Marketing Board*, 683 A.2d 972 (Pa.Cmwlth.1996).

Here, the Board concluded that it was Petitioners who misapprehended Bulletin 1376 and mistakenly questioned Herbein about Bulletin 1376 *retroactively* to past payments. The Board noted that Petitioners failed to take into account that voluntary premiums may be changed in the future and that dealers would, in fact, adjust them in response to the imposition of a mandatory expanded premium. According to the Board's interpretation, nothing in Bulletin 1376 prevented a dealer and producer from negotiating existing or new voluntary premiums. In light of Herbein's and Mullery's testimony that, in the face of the desired increase, Pennsylvania dealers would seek to decrease voluntary premiums, this Court believes that the Board's conclusion was reasonable.

Petitioners also argue that the Board erred when it relied on the testimony of Mr. Herbein, Mr. Mullery and Mr. Kinser relating to the "fungible" nature of money and voluntary premiums. The Board found:

The Board finds credible and persuasive Mr. Herbein's testimony that money is fungible and that dealers would react to a mandated New Jersey premium by simply recharacterizing and *relabeling existing voluntary overpayments.* We note that this testimony is supported by Mr. Mullery's credible and persuasive testimony. The Board also finds credible and persuasive the supporting testimony of Mr. Kinser that Dean had lowered a quality premium while increasing the state mandated premium in such a way that there was no impact on Dean's cost of raw milk.

\* \* \* \*

Based on the testimony of Mr. Herbein, Mr. Mullery and Mr. Kinser, we believe that dealers will, in compliance with 1376, adjust the existing premiums to comply with whatever over-order is in effect, leading to no net increase in producer payments.

Adjudication, April 1, 2009, F.F. No. 65 at 14 (Emphasis added).

According to Petitioners, the testimony the Board relied on was less than substantial compared to the testimony presented by Petitioners. Their witness, Mr. DeSantis, presented data which showed the historical relationship between mandatory premiums and voluntary or market driven premiums paid by dealers to producers. DeSantis concluded that an increase in mandatory premiums did not result in a corresponding decrease in voluntary or market driven premiums. They argue that this testimony was supported by audited data, studies, historical relationships of mandated and voluntary premium interaction, "real life" proof of mandated and voluntary premium interaction and evidence of existing transportation and raw milk costs of competing milk dealers. Petitioners argue that since no witness challenged this testimony, the Board's disregard of it was error.

The Board's finding that money is "fungible" was based on substantial evidence and did not constitute an abuse of discretion or error of law. Once again, the Milk Dealers' witnesses provided substantial credible testimony regarding the fungible nature of voluntary premium payments. The Board considered this testimony in light of its interpretation of Bulletin 1376, and *gave more weight* to the Milk Dealers' evidence and reasonably concluded that milk dealers would have an incentive (to stay competitive) to decrease voluntary premiums paid to producers so that dealers' net costs would not increase.

Accordingly, this Court must conclude this issue to be without merit.

## III.

### *Whether the Board Applied the Wrong Standard of Proof*

Last, Petitioners argue that the Board applied the wrong standard of proof. Petitioners assert that they met their initial burden, but the Milk Dealers failed to prove their affirmative defenses, specifically, that implementation of the Petition would actually cause them to become uncompetitive or lose business in New Jersey, which in turn would have caused them to lay off Pennsylvania producers. Petitioners contend there was no actual proof that (1) there was a causal connection between the expanded premium and loss of business, or (2) that Pennsylvania dealers could simply circumvent a Board order eliminating or recharacterizing their voluntary premiums, thus resulting in no additional premium payments to Pennsylvania dealers.

As previously stated, a scrutiny of this record reflects that the Board gave equal consideration to the interests of milk pro-

ducers, dealers, and the consuming public when fixing the price of milk. A review demonstrates that the Board fully discharged its responsibility and evaluated and weighed the evidence when it determined that Petitioners failed to persuade the Board that the expanded premium was appropriate when the impacts on all segments of the dairy industry were considered.

The Board's decision is affirmed.

Judge LEAVITT did not participate in the decision in this case.

### ORDER

AND NOW, this 6th day of August, 2010, the Order of the Pennsylvania Milk Marketing Board in the above-captioned case is hereby affirmed.