CONTINENTAL WEB PRESS, INC.,
Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner,

v.

CHICAGO LOCAL 245, GRAPHIC
ARTS INTERNATIONAL UNION,
AFL–CIO, Party-Intervenor-Respondent.

In re Application of CONTINENTAL
WEB PRESS, INC.

Nos. 83–2124, 83–2422.

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 24, 1984.

Decided June 25, 1985.

Rehearing and Rehearing En Banc
Denied Sept. 6, 1985.

Elliott Moore, N.L.R.B., Washington, D.C., for petitioner, cross-respondent.

Jerry Kronenberg, Borovsky, Ehrlich & Kronenberg, and Eugene Cotton, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for respondent, cross-petitioner.

Before POSNER and COFFEY, Circuit Judges, and KELLAM, Senior District Judge.*

POSNER, Circuit Judge.

After we set aside the Labor Board's order on August 30, 1984, see *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087 (7th Cir.1984), Continental Web Press applied to us for an award of roughly $18,000 in attorney's fees and related expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), which allows such awards if the government's position is not "substantially justified." The Board does not argue that its position was substantially justified, but it opposes the application on other grounds that raise issues of some novelty; and though the Act expired shortly after our decision (the expiration does not affect this application, however), it is expected to be reenacted in some form, and a discussion of the issues raised by the

Board may be helpful to Congress in deciding what form that shall be.

To be entitled to attorney's fees under the Act, a firm must have either a net worth no greater than $5 million or no more than 500 employees. 28 U.S.C. § 2412(d)(2)(B). The Board argues that the disjunctive form was unintentional—that both criteria must be met—and there is much support for this argument, see *Unification Church v. INS*, 762 F.2d 1077, 1083–1091 (D.C.Cir.1985), but we need not resolve the issue since in any event Continental Web Press meets both criteria, as we shall see. The Board concedes that Continental Web Press has no more than 500 employees, but not that it has a net worth of no more than $5 million. After depreciation, the company's net worth is well below $5 million; but before depreciation, it is well above $5 million, and the Board argues that depreciation ought not be subtracted in computing the company's net worth. At first glance, the argument seems ridiculous. A company's "net worth" (the statutory term) is the difference between its assets and its liabilities, and accumulated depreciation is either a liability or a reduction in the value of the assets. Either way it is no phantom—at least it need not be, as an example will show. Suppose a firm in 1965 buys a printing press for $1 million dollars that is expected to last 20 years. In 1984, when the press has another year of life, as it were, it would be unrealistic to say that the company had a printing press worth $1 million; for unless there has been an enormous increase in the price of printing presses over the period, no one will pay $1 million for a press that is about to wear out. Of course firms sometimes depreciate equipment faster than it actually wears out or obsolesces, Often there are tax incentives to do this, thought sometimes the company will have separate depreciation schedules for tax and ordinary business purposes so that rapid depreciation for tax purposes will not create an unrealistic picture of the current value of the firm's

* Hon. Richard B. Kellam of the Eastern District of Virginia, sitting by designation.

assets. And of course if prices are increasing over the life of a particular asset it may be worth more at any point during its life than its depreciated original cost. But this is just to say that a balance sheet only approximates economic reality, and does not reflect it perfectly. It would be arbitrary to say that because depreciation may sometimes result in understating a company's net worth it should be disregarded, and the company valued as if every piece of its capital equipment were brand-new, which is the Board's position.

The Board's entire support for its position is the following sentence in the legislative history of the Equal Access to Justice Act: "In determining the value of assets, the cost of acquisition rather than fair market value should be used." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 15 (1980), U.S. Code Cong. & Admin.News 1980, pp. 4953, 4994; S.Rep. No. 253, 96th Cong., 1st Sess. 17 (1979). All this means to us is that the net worth figure must be derived from the company's books rather than from an appraisal. There is no indication that Congress meant by "the cost of acquisition" the undepreciated cost of acquisition. As the Board acknowledges, subtracting accumulated depreciation from the cost of acquisition "is a generally accepted accounting practice." No reason is given why Congress might have wanted to reject it.

■ Congress did not define the statutory term "net worth." It seems a fair guess that if it had thought about the question, it would have wanted the courts to refer to generally accepted accounting principles. What other guideline could there be? Congress would not have wanted us to create a whole new set of accounting principles just for use in cases under the Equal Access to Justice Act. The proceeding to recover attorney's fees under the Act is intended to be summary; it is not intended to duplicate in complexity a public utility commission's rate of return proceeding. Although many cases say that waivers of sovereign immunity are to be narrowly construed, a closer case than this

one is necessary to put the precept into play.

■ The Board next argues that Continental Web Press was not—more precisely, is not yet—a prevailing party within the meaning of the Act, because we remanded the case for further proceedings. There might be some force to the Board's position—we need not decide how much—if it were possible that on remand the Board could reinstate the order that we vacated. But we said in our decision that the Board, which had ordered the company to bargain with the union, could not on remand enter another bargaining order. See 742 F.2d at 1094. The Board may still be able to enter a cease and desist order, or an order to post notices promising compliance with the National Labor Relations Act, or conceivably an order to hold a representation election. But the main thing the company opposed was the bargaining order, and as to that its victory was complete. The meaning of "prevailing party" seems to be the same under the Equal Access to Justice Act as under other attorney's fee statutes, such as 42 U.S.C. § 1988. See *Crosby v. Bowling*, 683 F.2d 1068, 1072, 1075 (7th Cir.1982) (semble); *Commodity Futures Trading Comm'n v. Rosenthal & Co.*, 545 F.Supp. 1017, 1018 (N.D.Ill.1982). And under those statutes, a party "prevails" if he wins a substantial part of what he sought. He doesn't have to win everything he originally sought; the average winning plaintiff does not. See, e.g., *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1278 (7th Cir. 1983); *Battle v. Anderson*, 614 F.2d 251, 258 (10th Cir.1980).

■ The Board also takes issue with the reasonableness of the company's fee request. Most of the Board's objections are captious, but one is not. The Act limits lawyers to a fee of $75 an hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). The company's effort to demonstrate special factors other than an increase in the

cost of living (inflation) is perfunctory and unpersuasive, but the Board does not contest the company's suggestion that it should receive a 10.6 percent increase in the statutory rate to reflect inflation ("increase in the cost of living"). The company says that, with the 10.6 percent, the hourly rate is $85.57, but our arithmetic yields $82.95. As mentioned, the Board does not contest the appropriateness of raising the hourly rate by 10.6 percent to reflect an increase in the cost of living since the Act was passed, pursuant to section 2412(d)(2)(A).

We do not agree with the company that it is entitled to an additional award of attorney's fees for the fee application itself. No doubt if a government agency resists such an application without substantial justification, which is the statutory criterion, it lays itself open to an additional award of fees. But although we have granted the company's application in principal part, we cannot say that the Board's opposition to it lacked substantial justification. The Board's main point, that net worth excludes depreciation, is (given the lack of statutory definition of the term, the language of the committee reports, and the principle of narrowly interpreting statutes waiving sovereign immunity) a respectable if ultimately unavailing legal point which the Board was right to press. Moreover, the Board has prevailed in its opposition to the extent of getting us to cut down the amount requested.

The Labor Board shall pay Continental Web Press $13,264.35 in attorneys' fees and expenses in this matter.

So Ordered.