**James W. NELSON, D.V.M., Petitioner**

v.

**STATE BOARD OF VETERINARY MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2007.

Decided Dec. 17, 2007.

April L. McClaine, Harrisburg, for petitioner.

Teresa Lazo, Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

James W. Nelson, D.V.M., petitions for review of an adjudication of the State Board of Veterinary Medicine (Board) denying his request for reimbursement of costs that he incurred in successfully defending against an enforcement action brought against him by the Bureau of Enforcement and Investigations of the Department of State (Bureau). In this case, we consider what evidence, if any, in addition to sworn testimony must be presented by an individual seeking to prove that his net worth is less than $500,000. This question arises from the statute commonly known as the Costs Act, Act of December 13, 1982, P.L. 1127, *as amended*, 71 P.S.

§§ 2031–2035,[1] which entitles an individual to reimbursement, up to a maximum of $10,000, of his costs to defend against an agency's action so long as his net worth does not exceed $500,000.

The facts regarding the Bureaus enforcement action against Nelson are set forth fully in this Courts opinion at *Nelson v. State Board of Veterinary Medicine,* 863 A.2d 129 (Pa.Cmwlth.2004) (*Nelson I* ). Briefly, the Bureau initiated an investigation after a pet owner complained that Nelson had difficulty euthanizing her dog, which was dying of congestive heart failure. While in Nelsons office to follow up on the complaint, the Bureaus investigator watched Nelson telephone the pet owner and in a loud voice upbraid her for complaining to the Bureau. Nelson used profane language, and the pet owner hung up on him. The Bureau charged Nelson with veterinary malpractice and professional incompetence. After a hearing on the Bureaus charges, the Board concluded that there was no basis to the Bureaus claim of veterinary malpractice. On the other hand, it held that Nelsons angry call to the pet owner constituted professional incompetence. Accordingly, the Board ordered a public reprimand of Nelson. It also ordered Nelson to take a course on effective communication with bereaved pet owners; to take an anger management course; and to send a letter of condolence and apology to the pet owner. Nelson appealed.

This Court reversed the Board. We held that "professional incompetence" refers not to "unprofessional conduct," such as swearing at the owner of a pet entrusted to the care of a licensed veterinarian. Rather, we held that "professional incompetence" describes conduct that has not yet resulted in malpractice but increases the risk for malpractice by, for example, failing to refer an animal to a specialist where appropriate. Our reasons were several.

First, we examined the applicable statute. The focus of the Veterinary Medicine Practice Act[2] is to ensure the proper diagnosis and treatment of animals. With respect to the relationship between the veterinarian and a pet owner, termed a "client" in the statute, the Act requires only that veterinarians (1) consult with clients and (2) make their records available to clients. Section 3(15) of the Act, 63 P.S. § 485.3(15).[3] The Act is otherwise silent.

Next, we looked at the Boards regulations that implement the Act. With respect to the veterinarian-client relationship, the regulation requires the veterinarian to "protect the privacy of clients;" to "readily withdraw from the case" where requested

---

1. The Costs Act expired as of July 1, 2007.

2. Act of December 27, 1974, P.L. 995, *as amended,* 63 P.S. §§ 485.1–485.35.

3. Section 3(15) of the Act states:
 (15) "Veterinarian-client-patient relationship" means a relationship satisfying all of the following conditions: (i) the veterinarian has assumed the responsibility for making veterinary medical judgments regarding the health of an animal and the need for veterinary medical treatment, and the client, owner or caretaker of the animal has agreed to follow the instructions of the veterinarian; (ii) the veterinarian has suffi- cient knowledge of the animal to initiate at least a general, preliminary or tentative diagnosis of the medical condition of the animal; (iii) the veterinarian is acquainted with the keeping and care of the animal by virtue of an examination of the animal or medically appropriate and timely visits to the premises where the animal is kept; (iv) the *veterinarian is available for consultation* in cases of adverse reactions to or failure of the regimen of therapy; (v) the *veterinarian maintains records on the animal* examined in accordance with regulations established by the board.
 63 P.S. § 485.3(15) (emphasis added).

by a client; and to "honor" a request for referral to another veterinarian by taking steps to "facilitate that referral." 49 Pa. Code § 31.21, Principle 7. The regulation does not direct a veterinarian to deal in a "professional" manner with clients.

With respect to "competency," the regulation states that a veterinarian must increase his professional knowledge and seek consultation with other "veterinarians" or other licensed professionals where appropriate. 49 Pa.Code § 31.21, Principle 1. In other words, competency refers exclusively to the medical treatment of an animal and not at all to the veterinarians relationship with the animals owner.

Finally, we looked at precedent that had addressed the question of whether the term "competence" is broad enough to include unseemly behavior by a licensed professional. *See Chaby v. State Board of Optometrical Examiners,* 35 Pa.Cmwlth. 551, 386 A.2d 1071 (1978) (a licensed optometrist who told a patient to "go to hell found not to be incompetent"); *Ciavarelli v. State Board of Funeral Directors,* 129 Pa.Cmwlth. 305, 565 A.2d 520 (1989) (licensed funeral directors irate telephone call to a priest for favoring a competitors funeral home found not to be "incompetent" conduct). In both cases, this Court held that reprehensible and impudent behavior did not constitute incompetency in practicing a profession.

■ Based upon the Act, the regulations and the case law precedent, we held that "professional incompetence" does not

equate with "unprofessional conduct," such as swearing at a dog owner. We held that the Board simply lacked the power under the Act to modulate the behavior of veterinarians by directing them to undergo anger management training or to pen notes of condolence. An agency may exercise only those powers expressly conferred upon it by the legislature in "clear and unmistakable language." *Aetna Casualty and Surety Company v. Insurance Department,* 536 Pa. 105, 118, 638 A.2d 194, 201 (1994) (citation omitted). We reversed the Board. *Nelson I,* 863 A.2d at 139.

On January 6, 2005, Nelson filed an application with the Board, seeking an award of fees and expenses pursuant to the Costs Act.[4] In his application, Nelson asserted that the holding in *Nelson I* demonstrated that the Boards enforcement action against him was not "substantially justified." The application further stated that Nelsons net worth did not exceed $500,000. Attached to his application were the itemized invoices from his attorney showing the amount of legal fees and costs Nelson incurred in defending against the Bureaus action and preparing the costs application. They totaled $16,400 in attorneys fees and $547.35 in costs. Application at ¶ 17. The application was verified by Nelson and by his attorney. The Bureau answered that it lacked sufficient information, knowledge or belief of Nelsons net worth and demanded strict proof thereof. In new matter, the Bureau objected to the payment of attorneys fees in

4. Nelson concurrently filed a precautionary Application for Award of Fees and Expenses with this Court pursuant to Section 3(f) of the Costs Act, which provides:

In the event a party appeals the underlying decision of the adversary adjudication, the court having jurisdiction over appeals from that Commonwealth agency shall forward fees and expenses to a prevailing party, other than the Commonwealth, unless the

court finds that during such adversary adjudication the position of the Commonwealth agency was substantially justified, or that special circumstances make an award unjust.

71 P.S. § 2033(f). The application presented to this Court was denied by order of January 21, 2005, with the direction that the application be presented first to the Board in accordance with Section 3(b) of the Costs Act.

excess of $75 per hour. The Board scheduled a hearing on Nelsons application.

Nelson testified that when the Bureau brought its action in September of 2003, his net worth was $342,315. Nelson prepared an exhibit, which was introduced into evidence, to explain how he arrived at this number. Reproduced Record at 159a–160a (R.R. ____). The exhibit listed his IRA account, valued at $189,780, which was the only asset in his name alone, as well as a series of assets Nelson owned jointly with his wife. The jointly held assets consisted of checking accounts, vehicles, a house, an apartment building, and the veterinary clinic where Nelson conducts his practice. Nelsons 50 percent share of the joint assets amounted to $302,285. The exhibit also listed liabilities, which consisted of outstanding mortgage loans on the apartment building and clinic, as well as one outstanding car loan. The debts totaled $299,500, which, reduced by 50 percent, left Nelson with a total net worth of $342,315. Nelson explained that his valuation of each asset was based on his review of tax records, business records, stock records and appraisals. On cross-examination, Nelson acknowledged that his exhibit did not include every item of personal property, such as used furniture, equipment and clothing that he believed to have only nominal value.[5] He stated that his jointly owned personalty could be valued, at most, at $30,000, which would add $15,000 to the total of $342,315 or $357,315. This still left a net worth well below the $500,000 maximum allowed under the Costs Act.[6]

Next, Nelson introduced his invoices for legal services. They totaled $16,400 through the filing of the application and $547.35 in costs. Nelson also testified that data from the U.S. Department of Labor shows that since 1983, when the Costs Act was enacted, the cost of living has doubled. This evidence was offered because the Costs Act allows for an increase in the statutory $75 hourly rate for legal services where justified by inflation or by the limited availability of qualified counsel.[7] James

5. The cross-examination went as follows:
 Q. Do you have an autoclave or something to sterilize instruments?
 A. Yes.
 Q. All those are assets of your clinic; is that right?
 A. Right.
 Q. But you didn't list those?
 A. They are minimal.
 * * *
 Q. This is not a complete statement of your net worth; is that correct?
 McCLAINE: Objection.
 WITNESS: Do you want the cost of my [handkerchiefs] and clothes?
 Q: You're the one who characterized this as your complete statement of net worth and now you're telling us this is not a complete statement?
 A: Don't [badger] me again.
 HEARING OFFICER: Answer the question.
 A: No, I don't have everything I own listed on that.
 R.R. 82a; Notes of Testimony, 6/28/05 at 30–31 (N.T. ____). On redirect, Nelson testified that his household furniture and equipment were old and fully depreciated. He testified:
 The equipment is old and not of any value. My furniture is 30 years old at the house. It has virtually no value.
 R.R. 83a; N.T. 33. In the interest of providing an expansive valuation of his net worth, Nelson valued all personalty at $30,000, which, reduced by his wife's half interest, left $15,000. Id.

6. The Bureau argued to the Board that Nelson's case was not trustworthy because he did not, initially, put personalty, other than his used cars, into his net worth calculation. This is absurd. First, Nelson was not trying to hide the fact that he owns furniture, equipment and clothing. Rather, he believed these items not relevant. Second, Nelson's net worth statement, even with furniture and clothing, was nowhere close to $500,000.

7. It states, in relevant part, as follows:
 attorney fees shall not be awarded in excess of $75 per hour unless an increase in the

J. Kutz, Esquire, former Chief Counsel for the Bureau of Professional and Occupational Affairs, and presently a partner in the law firm of Post Schell, testified that the $150 hourly fee claimed by Nelson in his application was low for practitioners specializing in administrative practice and procedure.[8] Hourly rates for this legal specialty range from $200 to $320 per hour. Kutz concluded that "it would be hard to find reasonable access to practitioners billing at $150 per hour...." R.R. 87a; N.T. 51.

The Bureau presented no evidence in opposition to Nelsons case. It subpoenaed no documents from Nelson for production at the hearing. It did nothing except cross-examine Nelson and argue that Nelson should have included furniture, equipment and clothing on his exhibit of assets and liabilities. It did not refute Nelsons evidence offered to show that reimbursement for legal services should be set at an hourly rate of $150.

The Board denied Nelsons application. It concluded that Nelson did not meet his burden of proving that he had a net worth of less than $500,000, the threshold to eligibility for recovery of costs under the Costs Act. The Board also held that, in any case, the Bureaus prosecution of Nelson was substantially justified, also rendering Nelson ineligible.

On appeal,[9] Dr. Nelson raises two issues. First, he contends that the Board erred in concluding that he did not prove that his net worth was less than $500,000. He argues that the Board had no foundation in the record or in law to support its various criticisms of Nelsons case, and it capriciously disregarded his evidence. Second, he contends the Board erred in concluding that the Bureaus enforcement action was substantially justified. Accordingly, Nelson contends that he is entitled to an award of $10,000 in attorneys fees and $547.35 in costs.

We begin with a review of the Board's adjudication. The Board concluded that Nelson was not a "party" eligible for recovery under the Costs Act.[10] The Costs Act states that a "party" eligible for cost reimbursement does not include:

(1) *Any individual whose net worth exceeded $500,000* at the time the adversary adjudication was initiated and *any sole owner of an unincorporated business,* or any partnership, corporation, association, or organization *whose net worth exceeded $2,000,000* at the time the adversary adjudication was initiated.

Section 2 of the Costs Act, 71 P.S. § 2032 (emphasis added). In sum, the net worth of any individual may not exceed $500,000,

---

cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding, justifies a higher fee. 71 P.S. § 2032 (fees and expenses).

**8.** The hourly rate actually charged by Nelson's counsel, April McClaine, Esq., was $180; the hourly rate charged by Nelson's other counsel, Charles I. Artz, Esq., was $200.

**9.** We may reverse a Board decision where petitioner demonstrates a violation of constitutional rights, an error of law or lack of substantial evidence to support the Board's findings of fact. *Energy Pipeline, Inc. v. Pub-*

*lic Utility Commission,* 726 A.2d 1128, 1130 n. 6 (Pa.Cmwlth.1999).

**10.** "Party" is defined in the Costs Act in two ways. First, it incorporates by reference Section 1 of the Administrative Agency Law, which defines a party as "[a]ny person who appears in a proceeding before an agency who has a direct interest in the subject matter of such proceeding." 2 Pa.C.S. § 101. Second, the Costs Act states that a "party" must be an "individual, partnership, corporation, association or public or private organization other than an agency." Section 2 of the Costs Act, 71 P.S. § 2032.

and the net worth of any business, whether constituted as a sole proprietorship, partnership or corporation, may not exceed $2,000,000 in order for an applicant to be eligible for costs. The Board evaluated Nelson's application as that of "any individual" and found that he did not prove a net worth less than $500,000. In doing so, the Board, which did not see or hear Nelson's testimony, did not find Nelson to be a credible witness. Further, the presiding officer who conducted the hearing did not make a credibility finding.[11] Instead, the Board concluded that Nelson's testimony alone was not sufficient to prove a net worth of less than $500,000 because it was "incomplete." Board Opinion at 13. The Board identified three deficiencies in this regard.

First, the Board asserted that Nelson did not establish "that he was qualified to make an individual and *business net* worth evaluation." Board Opinion at 11 (emphasis added).[12] The Board went on to assert that "reasonable" and "customary" statements of net worth generally include: personal and business tax returns; records of real estate holdings; records of receipts and disbursements of the business; and an evaluation issued by a certified appraiser or certified public accountant. *Id.*

Second, the Board emphasized that Nelson failed to produce certain documentation to corroborate his testimony. For example, Nelson did not produce a marriage license; a professional appraisal of his real estate; or bank and broker statements. Board Opinion at 11–12.

Third, the Board complained that Nelson's net worth exhibit was incomplete because it did not include all of his personal property. Although Nelson's exhibit listed his vehicles and their estimated blue book value, the Board noted that he did not identify the year and make of each vehicle. Further, other personalty such as furniture, clothing and clinic equipment, was omitted. The Board was unimpressed that after the question was raised at the hearing, Nelson added $15,000 for personalty to his net worth calculation, which raised his total net worth to $357,315.

 Nelson contends that the Board erred in several ways. First, he argues that the Board capriciously disregarded his unrebutted evidence of his net worth.[13] Nelson contends that his testimony alone was competent to establish his net worth and that the Board's assertion that documentary evidence was needed in addition to testimony is "utterly without foundation in the law." Nelson's Brief at 15. In support, Nelson directs the Court to case law precedent teaching that the testimony of the person who owns the assets and is responsible for the liabilities associated with those assets is evidence competent to prove the value of those assets. *See, e.g.,*

---

11. The reasons are unknown. The presiding officer was not authorized to issue a proposed report in this case even though the Board's rules on hearing procedures call for proposed reports.

12. This observation about a business evaluation was inappropriate because Nelson applied for costs as an individual, not a business applicant. If treated as a business applicant, then Nelson's net worth could reach $2,000,000 without affecting his eligibility.

13. An agency commits reversible error when it capriciously disregards competent evidence.

*See generally Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812 A.2d 478 (2002). Capricious disregard occurs when the fact-finder deliberately ignores relevant, competent evidence. *Frog, Switch & Mfg. Co. v. Pennsylvania Human Relations Commission*, 885 A.2d 655, 667 (Pa.Cmwlth.2005). The express consideration and rejection of evidence, however, does not constitute capricious disregard of evidence. *In re Nevling*, 907 A.2d 672, 675 n. 4 (Pa.Cmwlth.2006).

*In re Cooperman's Estate,* 487 Pa. 148, 151, 409 A.2d 8, 10 (1979) (noting that executor, when determining the value of an estate's assets, must exercise only "common skill, common prudence, and common caution."). Second, Nelson argues that in the absence of any evidence presented by the Bureau, the Board lacked any foundation for its critique of Nelson's case on his net worth. Stated otherwise, the Board's discourse of essentials of a "reasonable" statement of net worth is not supported by substantial evidence.

We agree with Nelson. The Board has erred. It violated not one, but several evidentiary principles that govern an administrative hearing and, indeed, any hearing.[14] The Board's claim that Nelson's case required documents goes beyond what is stated in the Costs Act.

 First, the Board erred in holding that Nelson had to prove his qualifications in order to testify about the value of his assets. In general, an owner is competent to testify about the value of his property so long as his testimony is based upon his personal knowledge. *Westinghouse Air Brake Co. v. City of Pittsburgh,* 316 Pa. 372, 376–377, 176 A. 13, 15 (1934) (an owner of real property is competent to give an opinion of the value of his property based on his personal knowledge.) An owner may also testify about the value of his personal property. *Semasek v. Semasek,* 509 Pa. 282, 289, 502 A.2d 109, 112 (1985). The key to competency is the owner's knowledge of his own property. *Markowitz v. P & C R.R. Co.,* 216 Pa. 535, 537,

65 A. 1097, 1098 (1907). Nelson was competent to testify about the value of his own property, and he did not have to further qualify himself in this regard.

 Second, the Board erred in finding that Nelson's case required not just testimony but a multitude of documents, ranging from deeds to bank statements. Written documents are not preferable to oral statements, as the Board suggests. There is no such evidentiary principle. *See Commonwealth ex rel. Park v. Joyce,* 316 Pa. 434, 439, 175 A. 422, 424 (1934) ("[T]here is no rule preferring written to oral statements."). A document needs only to be produced where the contents of a writing are at issue. *In re A Condemnation Proceeding by South Whitehall Twp.,* 822 A.2d 142, 145 (Pa.Cmwlth.2003). The best evidence rule does not apply where the matter to be proved exists independently of the writing. *Commonwealth v. Harris,* 719 A.2d 1049, 1051 (Pa.Super.1998). At issue here was the factual question of Nelson's net worth, which exists independently of any number of documents that might also be probative of that question. What the Board did was improperly invoke the best evidence rule, which requires the submission of documents into evidence only where the contents of those documents are at issue.[15] Nelson's testimony alone was sufficient to prove the value of his assets minus liabilities, *i.e.,* his net worth.

Third, the Board's critique of Nelson's net worth evidence lacks any foundation in

---

**14.** We cannot follow the development of the Board's dissection of Nelson's case in support of his net worth. There is no evidence from the Bureau that supports the Board's factual findings in this regard, and there is no proposed report from the presiding officer with any findings or analysis. Thus, it is impossible to discern just how the Board members tumbled to their critique of Nelson's case on net worth. Was it the result of one Board member's input, of several members or the work of their attorney? In any case, the Board's adjudication is fatally defective.

**15.** The fact that Nelson may have refreshed his recollection by reviewing bank records does not change this rule. *Perry v. Ryback,* 302 Pa. 559, 568, 153 A. 770, 773 (1931).

the record. Nelson listed on his exhibit all his real property and the "big ticket" items of his personal property, *i.e.*, his vehicles. The Board rejected this list as incomplete, asserting that a "reasonable and customary" statement of net worth will include income tax returns.[16] However, the Bureau put on no evidence, testimonial or otherwise, that a "reasonable" and "customary" net worth statement is anything other than what Nelson presented. The Board's bald allegation that Nelson's net worth statement was not "reasonable" or "customary" is not evidence at all, let alone substantial evidence. To cite another example, the Board complains that Nelson should have included the goodwill value of his veterinary practice as part of his net worth. Again, there is nothing on the record about the accounting concept of goodwill; when it is appropriate to consider it; or how it is to be calculated.

In order for the Board to challenge Nelson's methodology, the Bureau needed to produce some evidence. It did not. The Board's counsel explained that the Board members, who are veterinarians with personal knowledge about how to manage the business of a veterinary practice, relied on that personal knowledge to make their decision that Nelson should have included goodwill in his net worth.[17] This is error most fundamental. The personal knowledge of Board members is *dehors* the record. Only facts of record can be considered by a fact finder.

Finally, the Board's adjudication lacks a foundation in the Costs Act. Indeed, the Board's standards for how to prove net worth, announced only after the hearing,[18] would nullify the remedy in the Costs Act, if accepted by this Court.

The Costs Act is very specific about what must be presented by an applicant seeking to recover the costs of defending against an agency's enforcement action. It states as follows:

*A party seeking an award of fees and expenses shall submit an application for such award* to the adjudicative officer and a copy to the Commonwealth agency within 30 days after the final disposition of the adversary adjudication. The application shall include:

(1) A showing that the applicant is a *prevailing party* and is eligible to receive an award under this section.

(2) *A clear statement of the total amount sought,* including:

(i) an itemized list of fees from any attorney, agent or expert witness representing or appearing in behalf of the party;

(ii) the actual time expended by such agent or expert witness; and

(iii) the rate at which the fees and other expenses were computed.

(3) *An allegation that the position of the Commonwealth agency was not substantially justified.*

[t]he Governor's Office of Budget and Administration shall promulgate guide-

---

16. The proposition is not even accurate. A tax return measures income, which is irrelevant to a statement designed to measure net worth. Net worth is, simply, assets net of liabilities. *See* BLACK'S LAW DICTIONARY 1041 (6th ed.1990) (net worth is "the amount by which assets exceed liabilities").

17. The Board's counsel freely acknowledged at oral argument that the Board members relied on their personal knowledge and busi-

ness experience in running a veterinary practice. Counsel asserted that Board members "know" that their veterinary practices have an intangible value, known as goodwill, and they believe goodwill should have been included in Nelson's valuation of his assets.

18. We do not address the due process problem of announcing expectations, not in the Act, after the hearing.

lines or uniform procedures for the submission and consideration of applications for an award of fees and other expenses. Section 4(a) of the Costs Act, 71 P.S. § 2034(a). The Governor's Statement of Policy states that an "applicant shall provide a statement showing the net worth of the applicant" and *"in any form convenient to the applicant* that provides full disclosure of assets and liabilities and is sufficient to determine eligibility...." 4 Pa.Code § 2.6(c) (emphasis added). It further instructed that "each agency shall by rule establish specific procedures for the submission and consideration of applications." Section 4(b) of the Costs Act, 71 P.S. § 2034(b). The Board did not adopt a regulation. In the Nelson adjudication, the Board violated the Costs Act and the Statement of Policy in several ways.

First, the Board treated Nelson as a business, not an individual, applicant. To be consistent, then, Nelsons maximum net worth should have been measured at $2,000,000, not $500,000. A "party" is

> *any individual whose net worth exceeded $500,000* at the time the adversary adjudication was initiated and *any sole owner of an unincorporated business whose net worth exceeded $2,000,000* at the time the adversary adjudication was initiated.

Section 2 of the Costs Act, 71 P.S. § 2032 (emphasis added). The Board improperly elided the clear difference between an individual and a "sole owner of an unincorporated business." Apart from the fact that documents were not needed to corroborate Nelsons testimony, the type of documents demanded by the Board were not relevant to an individual applicant. Items such as business ledgers, accounts receivable, and business tax returns may be relevant to a business net worth but not to an individuals net worth. Similarly, the Boards complaint about the absence of goodwill was error because individuals do not have "goodwill," only businesses do.

In any case, the Boards observations about goodwill lack a grounding in the Costs Act even for a business applicant. In construing the Equal Access to Justice Act, 28 U.S.C. § 2412, the federal counterpart to the Costs Act, the federal courts have expressly rejected the idea that goodwill should be a factor in determining the net worth of a business.[19] This is because goodwill is an intangible asset that is only realized at the time a business is sold; a litigant cannot be expected to sell a business to raise legal defense costs. *Sanders v. Jackson,* 209 F.3d 998, 1001–1002 (7th Cir.2000). Further, goodwill is difficult to quantify and could result in an unnecessar-

**19.** In terms nearly identical to the Costs Act, the Equal Access to Justice Act provides recovery to those who successfully defend an enforcement action of the government. The federal statute also bases eligibility on net worth, although the maximum is $2,000,000 for an individual and $7,000,000 for a business. It defines a prevailing "party" as:

(i) *an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed,* or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed.

28 U.S.C. § 2412(d)(2)(B)(i)(ii) (emphasis added). "Net worth" under the Equal Access to Justice Act is understood to be assets minus total liabilities, using generally accepted accounting principles to value assets and liabilities. *Continental Web Press, Inc. v. National Labor Relations Board,* 767 F.2d 321, 323 (7th Cir.1985). GAAP principles use the lower acquisition cost, not market value, which yields a higher number. *Broaddus v. U.S. Army Corps of Engineers,* 380 F.3d 162, 170–74 (4th Cir.2004). Depreciation is subtracted from acquisition cost. *Continental Web Press,* 767 F.2d at 323.

ily complex evidentiary "mini-trial," which is to be avoided in every case. *Id.* at 1003. Indeed, the U.S. Supreme Court has explained that any application for costs "should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[20] The purpose of the net worth inquiry is to determine what resources are available to the applicant to pay legal expenses. *See Continental Web Press,* 767 F.2d at 323.

These observations apply with equal force to the Costs Act. Eligibility investigations should not be conducted as another round of litigation, especially where the maximum recovery is $10,000.

■ The Board erred in its application of the Costs Act. It treated Nelson as a business, not an individual, applicant when it critiqued his case. Even so, its demand for goodwill was inappropriate even for a business applicant because it is difficult to quantify and will lead to unnecessary litigation. Personalty is not an asset ever to be considered unless it is personalty of a type that could secure a loan. The Bureau presented no evidence that used furniture

and equipment can be used to raise funds for litigation, which is the focus in a net worth inquiry.[21] Most problematic, the Board turned the proceeding into another round of litigation about net worth, which is the least important factor in a Costs Act application. We know this because the General Assembly did not even require a statement about net worth in the application itself. The Board's after-the-fact dissection of Nelson's case imposed requirements not expressed in the Costs Act, a regulation or guideline, and, if accepted by this Court, would defeat the purpose of the Costs Act, which is to

> [d]iminish the deterrent effect of seeking review of or defending against administrative agency action by providing in specified situations an award of attorney's fees, expert witness fees and other costs against the Commonwealth.

Section 1(c)(1) of the Costs Act, 71 P.S. § 2031(c)(1).

■ In sum, the Board erred in its application of the law of evidence and in its application of the Costs Act.[22] It erred in

---

20. Courts have also explained that "some informality of proof is appropriate." *United States v. 88.88 Acres of Land, More or Less,* 907 F.2d 106, 108 (9th Cir.1990).

21. Nelson cannot be expected to pawn his autoclave, which he needs to practice veterinary medicine. The Bureau provided no evidence that financial institutions will collateralize loans with furniture and equipment. As explained, the purpose of the net worth statement inquiry is to identify resources available to pay legal fees.

22. Weight and credibility are indeed determinations for the fact finder, as noted by the dissent. This is an unassailable premise, but it does not pertain here. The dissent asserts that the Board "implicitly" found Nelson not credible. It can just as easily be said that the Board implicitly found Nelson credible and for that reason recited a number of reasons why his testimony alone was inadequate as a matter of law. What is clear from the adjudi-

cation is the Board's determination not to award costs.

The dissent also asserts that the Board may decide how much weight to give evidence. This is true, but it may not capriciously disregard competent, substantial evidence. It is clear what "weighing" can be done where only one side presents evidence.

The Board did two things. First, it held that testimony alone cannot prove an individual's own net worth. Second, it rejected Nelson's net worth methodology because, *inter alia,* it did not include an entry for goodwill. These are *legal determinations, not factual findings,* that are fully reviewable on appeal. Under the dissent's approach, none of the Board's stated reasons for finding Nelson's case "incomplete" even matter. By simply recharacterizing what the Board did, the dissent places the Board's actual legal conclusions beyond our review.

holding that Nelson was not qualified to opine on the value of his own property and opining that an accountant's statement was preferable.[23] It erred in holding that Nelson's testimonial evidence was not sufficient in itself to prove net worth because there was no issue here about the contents of any written document. It erred in finding that a "reasonable and customary" statement of net worth should include goodwill and personalty, such as furniture and equipment, because there is zero evidence in the record to support this claim. It erred in complaining about the absence of professional appraisals, business tax returns or business accounts because the value of Nelson's practice was not relevant; Nelson sought relief as an individual applicant. Finally, the Board erred by treating Nelson's costs application as another mini-trial.

None of the Board's stated reasons for finding Nelson's testimony insufficient to make his case on net worth withstand close scrutiny. When these errors are corrected, then the Board's failure to credit Nelson's testimony constitutes an arbitrary and capricious disregard of unrebutted evidence. Nelson's testimony, which was not rebutted, was sufficient to prove his personal net worth was well below $500,000. The Board erred in holding that Nelson failed to prove he was a "party" within the meaning of the Costs Act.

■ We next address the issue of whether the Bureau was substantially justified in initiating its enforcement action against Nelson. An agency's position is "substantially justified" when the position has a reasonable basis in law and fact. Section 2 of the Costs Act, 71 P.S. § 2032.[24] Nelson argues that the Bureau's charge of professional incompetence was unreasonable because it had no basis in the Act or its implementing regulation and was directly contrary to prior holdings of this Court in *Chaby* and *Ciavarelli*, that unprofessional behavior has nothing to do with professional incompetency.

In response, the Board contends that its action against Nelson was substantially justified because *Chaby* and *Ciavarelli* concerned a qualitatively different circumstance. The Board argues that what was different about Nelson's angry words is that they were made to a pet owner who complained to the Bureau, not to a disinterested member of the public. The Board suggests that Nelson's attempted interference with the Bureau's investigation was the real problem that prompted its sanction of Nelson. This is not persuasive.

First, the Board's argument has serious First Amendment implications. There is nothing an agency can do to prevent a person who is under investigation or who has been charged with a violation of statute from talking to a potential witness. There is no discovery in administrative hearings and, thus, no other way for a respondent to respond to an investigation and prepare for a hearing.

Second, the Board's sanction upon Nelson belies its present claim that it was

---

**23.** In *United States v. Heavrin*, 330 F.3d 723, 732 (6th Cir.2003), the government argued that the plaintiff should have to support his application affidavit with the "statement of an accountant." The court disagreed, emphasizing that there was no support in the statute for such a requirement. *Id.*

**24.** It states as follows:

"Substantially justified." The position of an agency as a party to a proceeding is substantially justified when such position has a reasonable basis in law and fact. The failure of an agency to prevail in a proceeding, or the agreement of an agency to settle a controversy, shall not raise a presumption that the position of the agency was not substantially justified.

71 P.S. § 2032.

trying to protect the sanctity of its investigations. The Board's directive that Nelson study anger management and write a letter of condolence and apology to a dog owner has nothing to do with the Bureau's ability to investigate veterinary malpractice. The Board was concerned about Nelson's rudeness. *Chaby* and *Ciavarelli* established that rudeness by a professional does not constitute professional incompetence. We hold that the Bureau's enforcement action was not substantially justified.

 We come, then, to the appropriate relief to order in light of our holding that the Bureau's action against Nelson was not substantially justified and that Nelson was a "party" under the Costs Act eligible to recover his costs. With respect to cost recovery, the Costs Act states, in relevant part, as follows:

> [A]ttorney fees shall not be awarded in excess of $75 per hour *unless an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding,* justifies a higher fee. No award of fees and expenses shall be made where such fees and expenses are less than $250, and no award shall be greater than $10,000.

Section 2 of the Costs Act, 71 P.S. § 2032 (emphasis added).[25] At no point did the Bureau ever question the hours of work claimed by Nelson's attorney. The Bureau did not rebut Nelson's testimony that the cost of living doubled between 1983 and 2003, when the Bureau initiated its action. Similarly, the testimony of Nelson's witness, Attorney Kutz, was unrebutted. He testified that an hourly rate of $150, which is the $75 statutory rate doubled for a 100 percent increase in the cost

of living from 1983 to 2003, was low for an attorney specializing in administrative practice and procedure. The Bureau produced no evidence, and there is no basis in the record, therefore, for the Board to find that Nelson could have found an attorney to take his case for $75 per hour.

We hold that Nelson's evidence proved that the $75 statutory hourly rate should be increased to $150 per hour to account for inflation and for the need to have "reasonable access" to representation. An hourly rate of $150 is lower than the rate actually charged to Nelson; there is no evidence to support any rate other than $150 per hour; and the Bureau waived any issue about the number of hours spent by Nelson's attorneys on his behalf. Finally, a rate of $150 results in a total cost to Nelson that cannot be reimbursed in full because it exceeds the maximum award of $10,000.

For these reasons, we reverse the Board and remand the matter to the Board with the direction to award Nelson $10,000, the maximum allowed under the Costs Act.

### ORDER

AND NOW, this 17th day of December, 2007, the order of the State Board of Veterinary Medicine, dated December 12, 2006, is hereby REVERSED and the matter is REMANDED to the Board to make an award of $10,000 to James W. Nelson, D.V.M.

Jurisdiction relinquished.

DISSENTING OPINION BY President Judge LEADBETTER.

While the Board did not explicitly state that it found Dr. Nelson's testimony as to

---

**25.** The language of Section 2 of the Costs Act precludes an award of $10,000 plus costs as sought by Nelson.

his overall net worth incredible or unpersuasive, it seems to me that its analysis of his testimony clearly amounts to such a finding. Indeed, it seems quite clear to me that the Board was not persuaded by Dr. Nelson's net worth estimate because he failed to support it with even the most ordinary documentation, such as bank and tax records, and because it was lacking in significant detail. Thus, it found that he had failed to meet his burden of proof. Since weight and credibility of evidence are the Board's province, I must respectfully dissent.